IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | NO. 1:13CV00254 |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NUCARE CAROLINA AMBULANCE, INC. | ) | |
| | ) | |
| DEFENDANT. | ) | |

## COMPLAINT OF THE UNITED STATES OF AMERICA

NOW COMES the United States of America, by and through Ripley Rand, United States Attorney for the Middle District of North Carolina, and alleges as follows:

### I. NATURE OF ACTION

1. The United States brings this action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, and to recover damages and other monetary relief under the common law or equitable theories of payment by mistake of fact, unjust enrichment, and fraud.

2. The United States (hereinafter referred to as the "United States" or the "Government") alleges that Defendant

Nucare Carolina Ambulance, Inc.,(hereinafter referred to as "Nucare") submitted false or fraudulent claims for payment to Medicare, a federal healthcare program, for ambulance transport services that were not reasonable, medically necessary or covered by the Medicare Program.

## II.  JURISDICTION

3.    The Court has jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345.  The Court also has jurisdiction pursuant to 31 U.S.C. § 3732(a), in that at all times relevant to this Complaint Nucare transacted business within the Middle District of North Carolina. Additionally, under 28 U.S.C. § 67(a) the Court has supplemental jurisdiction with regard to the common law and equitable causes of action.

## III. VENUE

4.    Venue is proper in the Middle District of North Carolina pursuant to 31 U.S.C. § 3732 and 28 U.S.C. §§ 1391(b) and (c) because during the time period relevant to this Complaint as Nucare transacted business within this District. Additionally, venue is proper in that during the

2

time period set out herein Nucare committed acts in violation of 31 U.S.C. § 3729 in the Middle District of North Carolina.

## IV. PARTIES

5.  The Plaintiff is the United States of America.

6.  Nucare is a legal entity incorporated in the State of North Carolina on September 8, 2001 with its principal place of business in Forsyth County, North Carolina.  At all times relevant to this Complaint, Nucare was a participating supplier[1] in the Medicare Program providing ambulance transportation services to persons who have health care insurance through the Medicare Program ("Beneficiaries").

## V. LEGAL BACKGROUND

### A.    The False Claims Act

---

[1]   Under the Medicare Program, CMS enters into agreements with suppliers in order to establish the suppliers' eligibility to participate in the Medicare Program.  Nucare's Supplier Agreement became effective May 29, 2001.

Case 1:13-cv-00254-WO-JEP   Document 1   Filed 03/27/13   Page 3 of 38

7.    The False Claims Act, 31 U.S.C. §§ 3729 et seq.,

provides, in pertinent part, that:

> (a) Any person who (1) knowingly
> presents, or causes to be presented, to
> an officer or employee of the United
> States Government    . . . a false or
> fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to
> be made or used, a false record or
> statement to get a false or fraudulent
> claim paid or approved by the Government;
> (3) conspires to defraud the Government
> by getting a false or fraudulent claim
> paid or approved by the Government; . . .
> . or (7) knowingly makes, uses or causes
> to be made or used, a false record or
> statement to conceal, avoid, or decrease
> an obligation to pay or transmit money or
> property to the Government,
>
> . . . . is liable to the United State
> Government for a civil penalty of not
> less than $5,500 and not more than
> $11,000, plus 3 times the amount of
> damages which the Government sustains
> because of the act of that person. . . .
>
> (b) For purposes of this section, the
> terms "knowing" and "knowingly" mean that a
> person, with respect to information (1)
> has actual knowledge of the information;
> (2) acts in deliberate ignorance of the
> truth or falsity of the information; or
> (3) acts in reckless disregard of the
> truth or falsity of the information, and
> no proof of specific intent to defraud is
> required.

4

31 U.S.C. § 3729.

**B.  Medicare Coverage of Ambulance Transportation Services**

8.   The Medicare Program is the federal health insurance program for the aged and disabled established by Congress in 1965, as Title 18 of the Social Security Act, codified at 42 U.S.C. § 1395. The Program is comprised of four (4) parts, Medicare Parts A, B, C and D. Only Medicare Part B is at issue in this case. The Program is administered through the Centers for Medicare and Medicaid Services (CMS) (previously the Health Care Financing Administration (HCFA)), a component of the Department of Health and Human Services of the United States (HHS). Administration is further delegated to private insurance carriers to process and pay claims.

Funding for Medicare Part B is through insurance premium payments established by HHS paid monthly by enrolled Beneficiaries (eligible individuals who are disabled or age sixty-five (65) or older) and contributions

5

from the Federal Treasury. In return for payment of said premiums, Beneficiaries receive insurance benefits from the Medicare Program to pay for medical services they receive. Frequently, a supplier of medical services accepts assignment of the right to payment from a Beneficiary. In that case, upon receipt of a claim from a supplier for services rendered to a Beneficiary, the Medicare Carrier pays the supplier a significant portion of the claim. The Beneficiary, or his or her supplemental insurance carrier (including Medicaid in some instances), is required to pay the balance owed the supplier. The Beneficiary's payment is sometimes referred to as a "co-pay." Beneficiaries also pay deductibles.

9. In order to bill the Medicare Program, a supplier must submit a paper claim form called a CMS 1500 (formerly known as a HCFA 1500) or submit the claim electronically. When the CMS 1500 is executed, the supplier certifies that the services for which a claim is submitted are "medically indicated and necessary for the health of the patient." When the supplier executes an Electronic Data Interchange

6

(EDI) Enrollment Form, it agrees that claims submitted electronically are accurate, complete and truthful.

10. The supplier must also state that the Current Procedural Terminology (CPT)[2] numeric codes and/or <u>Healthcare Common Procedure Coding System</u>, Medicare's National Level II Codes, (HCPCS) alphanumeric codes it uses on claims accurately describe the procedures or services rendered for which it is billing Medicare.

11. All healthcare providers and suppliers, including ambulance transportation service suppliers, must comply with applicable statutes, regulations and guidelines in

---

[2] The HCPCS System is a three-level coding system which provides a uniform method for health care providers and medical suppliers to report professional services, procedures and supplies. Level 1 – CPT is the American Medical Association's (AMA) *Physician's Current Procedural Terminology* (CPT), published annually. Level 1 Codes include five-digit codes and two-digit modifiers, both with descriptive terms for reporting services performed by health care providers and suppliers. Level 2 – HCPCS National Codes contains codes not found in the CPT and which are required to report medical services and supplies. A HCPCS code consists of one alphabetic character followed by four digits, and may also include two-digit modifiers. It is published annually by CMS with input from private insurance companies. Level III – Local Codes are not at issue in this case.

7

order to be reimbursed by Medicare Part B. A supplier has a
duty to have knowledge of the statutes, regulations and
guidelines regarding coverage for the Medicare services,
including, but not limited to, the following:

a. Medicare covers only reasonable and
necessary medical services. 42 U.S.C. § 1395y
(a)(1)(A);

b. Health care services are provided
economically, and then, only when, and to the
extent, they are medically necessary. 42
U.S.C. § 1320c-5(a)(1);

c. Compliance with all Medicare program
instructions applying to it and must both
acknowledge that all such instructions are
available from the Medicare contractor and
that payment is contingent upon its compliance
with all applicable laws, regulations and
program instructions. 855 Application; and

> d. The federal Medicare regulation excludes from payment services that are not reasonable and necessary. 42 C.F.R. § 411.15(k)(1).

12. The Secretary of HHS is authorized to define what services meet the criteria of reasonable and necessary. 42 U.S.C. § 1395ff(a). HHS issues a Medicare Benefit Policy Manual (BPM) which is distributed to all Medicare suppliers to inform Medicare suppliers of its reimbursement policies and procedures. HHS also provides similar manuals to fiscal intermediaries ("the Intermediary Manual") and to Medicare carriers ("the Carrier Manual"). These manuals (collectively, "the Medicare Manuals"), along with other publications, including but not limited to Bulletins, are essential sources of information from CMS to providers, suppliers, intermediaries, and carriers regarding Medicare coverage policies.

13. The BPM sets forth Medicare's ambulance transport coverage policy and cites instances when ambulance transport would be covered by Medicare. BPM, (Rev. 130, 07-290-10, Rev. 133, 10-22-10). Specifically, Medicare

9

provides coverage in the event of an emergency and when transport is necessary and reasonable. Section 10.2 of the BPM states, in part:

> Medical necessity is established when the patient's condition is such that use of any other method of transportation is contraindicated. In any case in which some means of transportation other than an ambulance could be used without endangering the individual's health, whether or not such other transportation is actually available no payment shall be made for ambulance services.

BPM, Chapter 10 – Ambulance Services, Section 10.2.1

Further, Section 10.2.3 provides, with regard to bed-confinement, that the medical necessity "requirement…is met …when the beneficiary was bed-confined before and after the ambulance trip." BPM, Chapter 10 – Ambulance Services, Section 10.2.3

14. Medicare specifically defines "bed-confined" as "unable get up from bed without assistance; unable to ambulate; and unable to sit in a chair or wheelchair." In fact:

> The term "bed confined" is not synonymous with "bed rest" or "non-ambulatory." Bed-confinement,

10

by itself, is neither sufficient nor is it
necessary to determine the coverage for Medicare
ambulance benefits.  It is simply one element of
the beneficiary's condition that may be taken into
account in the intermediary's/carrier's
determination of whether means of transport other
than an ambulance were contraindicated.

BPM, Chapter 10 – Ambulance Services, Section 10.2.3

In other words, if the beneficiary is able to sit, such
as sitting in a wheelchair, ambulate, and get out of bed
without assistance, and there are no other circumstances
that would contraindicate transport by vehicle other than
an ambulance, transport by ambulance is not medically
necessary and therefore not covered by Medicare. Section
20-2(a) of the  BPM defines the circumstances under which a
contractor may presume that the patient is suffering from
an illness or injury contraindicating transportation by
means other than ambulance when the patient:

- Was transported in an emergency situation, e.g. as a
  result of an accident, injury or acute illness; or
- Needed to be restrained to prevent injury to the
  beneficiary or others; or
- Was unconscious or in shock; or
- Required oxygen or other emergency treatment during
  transport to the nearest appropriate facility; or

11

- Exhibits signs and symptoms or acute respiratory distress or cardiac distress such as shortness of breath or chest pain; or
- Exhibits signs and symptoms that indicate the possibility of acute stroke; or
- had to remain immobile because of a fracture that had not been set or the possibility of a fracture; or
- Was experiencing severe hemorrhage; or
- Could be moved only by stretcher; or was bed-confined before and after the ambulance trip.

15. Additionally, Section 10 states that "[i]t is important to note that the presence (or absence) of a physician's order for a transport by ambulance does not necessarily prove (or disprove) whether the transport was medically necessary." BPM, Chapter 10 – Ambulance Services, Section 10.2

16. Medicare suppliers are required to disclose all known errors and omissions in their claims for Medicare reimbursement to their fiscal intermediaries or carriers. 42 U.S.C. § 1320a-7b(a) states in part:

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such

12

> benefit or payment either in a greater
> amount or quantity than is due or when no
> such benefit or payment is authorized . .
> . shall . . . be guilty of a felony . . .
> .

17. Since March 2, 1988, Medicare regulations have expressly stated that one of the "basic conditions" for a supplier to receive payment from Medicare is that the supplier "must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment." 42 C.F.R. § 424.5(a)(6). Prior to that time, Medicare regulations included the requirement: "The [supplier] shall furnish such information to the intermediary as may be necessary to assure proper payment by the program." 42 C.F.R. § 405.406(d). Additionally, suppliers are required to retain complete and accurate supporting documentation on all Medicare claims. Bulletin, Aug/Sep 1997, pp. 15-18

18. The BPM also provides specific guidance as to Medicare coverage of ambulance transports with regard to originating and destination locations. Suppliers must use two digit location modifiers, indicating the originating

13

and destination locations, in claims for ambulance transport services. Medicare does not cover ambulance transportation to or from a physician's office except in very limited circumstances. In fact, the BPM states clearly and with particularity that:

> A physician's office is not a covered destination. However, under special circumstances an ambulance transport may temporarily stop at a physician's office without affecting the coverage status of the transport….These trips are covered only under the following circumstances:

- The ambulance transport is enroute to a Medicare covered destination as described in §10.3; and

- During the transport, the ambulance stops at a physician's office because of the patient's dire need for professional attention, and immediately thereafter, the ambulance continues to the covered destination.

BPM, Chapter 10 – Ambulance Services, Sections 10.3 and 10.3.8

## VI. THE FRAUDULENT CONDUCT

19. On June 21, 2001, Nucare submitted an application to Medicare to be enrolled as a supplier. The application was signed by Pauline Caviness as the managing director and

14

sole owner. In the application, Pauline Caviness stated the following under oath:

a. "I have read the contents of this application."

b. "My signature legally and financially binds this supplier to the laws, regulations, and program instructions of the Medicare Program."

c. "I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. Medicare laws, regulations and program instructions are available through the Medicare contractor."

d. "I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions and on the supplier's compliance with all applicable conditions of participation in Medicare."

e. "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare."

15

f.   I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

20. Nucare violated all the terms of this application. Over a period of years, Nucare submitted materially false claims to Medicare concerning ambulance transportation services rendered to Medicare Beneficiaries as discussed below.

21. Prior to filing this complaint, the Government produced a statistical sample to assist in this case. The purpose of the statistical sample was to determine whether Nucare routinely billed federal healthcare programs for medically unnecessary ambulance transports. The Government reserves the right to supplement or revise this sample prior to trial in this matter.

22. The sample encompassed Nucare's ambulance transportation services paid by the Government during the time period August 1, 2001 through April 30, 2004.

23. The sample consisted of randomly selected dates of service for 634 individual transportation claims.

24.  On or about November 8, 2005, the Government served an administrative subpoena on Nucare. This administrative subpoena provided the Medicare Beneficiaries and dates of service included in the sample and requested that Nucare provide complete records for each.

25.  After Nucare produced the records for the 634 individual transportation claims in the sample, the records provided by Nucare were reviewed by an expert, a physician who previously served, among other comparable positions, as the Medical Director for a Medicare Part A intermediary and a Medicare Part B carrier.

26.  First, the expert found that the records provided by Nucare were, in many instances, incomplete.

27.  Second, the expert found that during the time period in question, Nucare billed the Government for at least twenty-four (24) claims for non-covered ambulance transports to or from a physician's office or clinic and at least 479 claim line items, out of 634 claim line items, for ambulance transports that did not meet Medicare's

17

definition of medical necessity. Therefore, Nucare had a billing error rate of approximately 75.55%.

28. The Government alleges that such a significantly high billing error rate is evidence that Nucare acted with actual knowledge, deliberate ignorance or reckless disregard of the laws, regulations and guidance applicable to Medicare when submitting claims for ambulance transportation. Approximately three (3) of every four (4) claim line items submitted were wrong.

29. Nucare received hundreds of thousands of dollars in Medicare reimbursement for these transports. As a result of Nucare's actions, the United States paid for ambulance transports that were not medically necessary and that the United States would not have paid had it known the true nature of the transports. To the extent that Nucare improperly obtained Medicare reimbursement for ambulance transports that are not specifically disclosed in this complaint, the Government seeks recovery for those claims as well.

*Claims for Ambulance Transports to or from a*
*physician's office not covered by Medicare.*

30. As set out above in Paragraph 18 above, except in very limited circumstances, Medicare does not cover ambulance transportation to or from a physician's office. BPM, Chapter 10 - Ambulance Services, Section 10.3. Suppliers indicate originating and destination locations on claims for ambulance transports by using two digit location modifiers. The following are examples of claims filed by Nucare for ambulance transports to or from physicians' offices that do not meet the limited criteria for Medicare coverage.

31. Nucare transported **Beneficiary JC** by ambulance on or about May 7, 2002, July 30, 2002 and May 23, 2003. **Beneficiary JC** was a 65 year old male transported on each occasion from a physician's office to his residence. The Government's expert reviewed the records for **Beneficiary JC** and found that each of these claims did not meet the criteria for ambulance transportation from a physician's

19

office. Further, the expert found that even if the criteria had been met, the transports were not medically necessary. Thus, for **Beneficiary JC**, Nucare billed and was paid by the Government for ambulance transports that were not medically necessary and originated from a non-covered location.

32. As another example, Nucare transported **Beneficiary PL** by ambulance on or about December 18, 2003. **Beneficiary PL** was a 66 year old female transported from her physician's office to her residence. The Government's expert reviewed the record for **Beneficiary PL** and found that the claim did not meet the criteria for ambulance transport from a physician's office. Thus, for **Beneficiary PL**, Nucare billed and was paid by the Government for an ambulance transport originating from a non-covered location.

33. By way of further examples, Nucare transported **Beneficiary PL2** by ambulance on or about January 2, 2003, January 30, 2003, September 19, 2003 and March 12, 2004. **Beneficiary PL2** was a 37 year old male transported from his

20

physician's office to his residence. The Government's
expert reviewed the records for **Beneficiary PL2** and found
that the claims did not meet the criteria for ambulance
transports to or from a physician's office. Additionally,
Nucare used the location modifier to indicate that in each
instance, **Beneficiary PL2** was transported from a hospital,
not a physician's office. Thus, for **Beneficiary PL2**,
Nucare billed the Government for ambulance transports that
were not covered, but fraudulently coded on the submitted
claims so that the transports would appear to be
originating from a hospital, and thus, covered by Medicare.
Nucare billed and was paid by the Government for these non-
covered, fraudulently coded transports.

34. As additional examples, Nucare transported
**Beneficiary MB** by ambulance on or about February 27, 2003
and March 13, 2003. **Beneficiary MB** was an 80 year old
female who was transported from a physician's office to her
residence on those two occasions. The Government's expert
reviewed the records for **Beneficiary MB** and found that the
claims did not meet the criteria for ambulance transports

to or from a physician's office. As in the previous
paragraph, Nucare used the "hospital" code modifier, not
the "physician's office" code modifier, to receive payment
for non-covered transports originating from physicians'
offices. Nucare billed and was paid by the Government for
ambulance transports that were fraudulently coded so that
the transports would be covered (and thus paid) by
Medicare.

35. Nucare transported at least an additional twenty
(20) Beneficiaries from physician's offices to residences,
skilled nursing facilities or residential, domiciliary, or
custodial facilities. None of these transports met the
criteria for Medicare coverage of transports to or from
physicians' offices or other facilities. These twenty (20)
transports are for the following Beneficiaries: **Beneficiary
OB, Beneficiary LB, Beneficiary MB, Beneficiary DB,
Beneficiary KC, Beneficiary OC, Beneficiary CMC,
Beneficiary HD, Beneficiary VI, Beneficiary LL, Beneficiary
CMM, Beneficiary JM, Beneficiary PM, Beneficiary MN,**

22

**Beneficiary SO, Beneficiary PP, Beneficiary SR, Beneficiary DS, Beneficiary BW and Beneficiary EW.**
Nucare billed and was paid by the Government for these fraudulently billed ambulance transports.

### *Claims for medically unnecessary Ambulance Transports not covered by Medicare.*

36.  In addition to submitting fraudulent claims for non-covered services, for which examples were given in the above paragraphs, Nucare also billed Medicare for medically unnecessary ambulance transport services in that the Medicare Beneficiaries were not bed confined and/or there was no other evidence indicating that they could not have been transported safely in other types of vehicles. Examples of this type of fraudulent conduct are as follows:

37.  On March 25, 2003, Nucare transported **Beneficiary HB** from the hospital to her residence by ambulance.  Upon arrival at her residence, **Beneficiary HB** stood, pivoted and was transferred to a chair, according to Nucare's Ambulance Call Report (ACR) which is completed by Nucare staff. The

Government's expert reviewed the records for **Beneficiary HB** and found that this transport was medically unnecessary. **Beneficiary HB** was able to walk and sit and there is no other evidence that she could not have traveled safely in another type of vehicle. Nucare billed and was paid by the Government, for this ambulance transport that was not medically necessary.

38. Another example of a medically unnecessary transport is Nucare's transport of **Beneficiary EB** on March 17, 2003. The ACR states that upon Nucare's arrival to pick up **Beneficiary EB**, he was sitting in a chair. The Government's expert reviewed the records for **Beneficiary EB** and found that this transport was medically unnecessary since **Beneficiary EB** was able to sit and could have traveled safely in another type of vehicle. Nucare billed and was paid by the Government for this medically unnecessary ambulance transport.

39. A third example of a medically unnecessary transport is Nucare's transport of **Beneficiary JHC** on November 8, 2003. Nucare transported the patient from a

24

hospital back to his extended care facility and left him standing with his walker inside the facility. The **Beneficiary JHC** was clearly able to walk and there is no evidence that he could not have traveled safely in another type of vehicle. The Government's expert reviewed the records for **Beneficiary JHC** and found that this transport was medically unnecessary. Nucare billed and was paid by the Government for this medically unnecessary ambulance transport.

40. As another example of a medically unnecessary ambulance transport, Nucare transported **Beneficiary BA** on February 4, 2004 from a hospital to a skilled nursing facility. Upon arrival at the hospital, Nucare personnel found **Beneficiary BA** sitting in a chair. At the hospital, **Beneficiary BA** walked to the stretcher with minimal assistance, and upon arrival at the skilled nursing facility, she was placed in a facility wheelchair. The Government's expert reviewed the records for **Beneficiary BA** and found that this transport was medically unnecessary. **Beneficiary BA** was able to ambulate with assistance, could

25

sit, and could have traveled safely in another type of vehicle. Nucare billed and was paid by the Government for this non-covered, medically unnecessary transport.

41. By way of further example of a medically unnecessary ambulance transport, Nucare transported **Beneficiary RB** on January 7, 2004 from a hospital to her home, where she lived "independently with husband." **Beneficiary RB** had been admitted for an elective catheter intervention. The social worker wrote that **Beneficiary RB** required an ambulance transport to home "as she has no other transportation." Essentially, Nucare acted as a taxi service. The Government's expert reviewed the records for **Beneficiary RB** and found that this was non-covered transport since **Beneficiary RB** underwent uncomplicated coronary intervention and there is no other evidence that she could not have traveled safely in another type of vehicle. Nucare billed and the Government paid for this medically unnecessary ambulance transport.

42. An additional example of a medically unnecessary ambulance transport is the July 28, 2003 ambulance

26

transport of **Beneficiary TB** from a hospital emergency department to an extended care facility. **Beneficiary TB** went to the emergency department to have a ring removed from her ring finger.  The ring was removed and the finger was splinted.  There are no notes indicating that the patient was combative or belligerent.  The Government's expert reviewed the records for **Beneficiary TB** and found that this transport was medically unnecessary. There is no other evidence that **Beneficiary TB** could not have traveled safely in another type of vehicle.  Nucare billed and was paid by the Government for this medically unnecessary ambulance transport.

43.  As another example of a medically unnecessary ambulance transport, Nucare transported **Beneficiary CC** on January 7, 2003 from a hospital to her residence. While in the hospital, **Beneficiary CC** was transported from an Intensive Care Unit bed to a regular bed via wheelchair. The ACR states that "pt (patient) walked to stretcher," and noted that the attendant assisted her ambulation. Upon arrival at her home, **Beneficiary CC** ambulated to a

27

wheelchair with assistance.  There is no evidence that the **Beneficiary CC** could not have traveled safely in another type of vehicle. The Government's expert reviewed the records for **Beneficiary CC** and found that this transport was medically unnecessary. Nucare billed and was paid by the Government for this medically unnecessary ambulance transport.

44. Yet another example of a medically unnecessary ambulance transport is the January 17, 2002 ambulance transport of **Beneficiary ABC** from a hospital to a skilled nursing facility. The ACR states that Beneficiary ABC was "found standing…ambulatory with assistance…[and] transported seated on a chair."  This was a medically unnecessary transport because the patient was ambulatory with assistance, was in fact, transported in a sitting position and there is no other evidence that **Beneficiary ABC** could not have traveled safely in another type of vehicle.  Nucare billed and was paid by the Government for this medically unnecessary ambulance transport.

45. A further example of a medically unnecessary ambulance transport is Nucare's ambulance transport of **Beneficiary AC** on February 27, 2004 from a hospital to an assisted living facility. Nursing notes state that Beneficiary AC was up in a chair and ambulating, and was only put back in bed (from chair) so she could be "picked up" by Nucare. This was a medically unnecessary transport because **Beneficiary AC** was ambulatory, able to sit in a chair and there is no other evidence that she could not have traveled safely in another type of vehicle. Nucare billed and was paid by the Government for this medically unnecessary ambulance transport.

46. Another example of a medically unnecessary ambulance transport is Nucare's October 12, 2001 transport of **Beneficiary LM** from a physician's office to her residence. **Beneficiary LM** was sitting in a recliner, waiting, when Nucare arrived at her residence to transport her to the physician's office. The ACR states that when Nucare employees returned to the physician's office to transport **Beneficiary LM** back to her residence, she was

29

sitting on the exam table. There is no other evidence that the patient could not have traveled safely in another type of vehicle. The Government's expert reviewed the record for **Beneficiary LM** and found that the claim did not meet the criteria for ambulance transport from a physician's office. Further, the expert found that even if the criteria had been met, the transport was not medically necessary. Thus, for **Beneficiary LM**, Nucare billed and the Government paid for an ambulance transport that was not medically necessary, and fraudulently billed as a covered transport from the hospital.

47. Another example of a medically unnecessary ambulance transport is Nucare's ambulance transport of **Beneficiary NO** on September 11, 2001 from a hospital to an extended care facility that was not the nearest appropriate destination or nursing home.[3] Instead, Nucare transported

---

[3] 42 C.F.R. §410.40(e)(1) provides that Medicare covers ambulance transportation "from any point of origin to the nearest hospital, CAH (Critical Access Hospital) of SNF (Skilled Nursing Facility) that is capable of furnishing the required level and type of care for the beneficiary's illness or injury." (Emphasis added.)

30

**Beneficiary NO** to a facility that was preferred by and nearest to **Beneficiary NO's** family (daughter).  However, **Beneficiary NO** anticipated that the transport would not be covered by Medicare and paid Nucare before the transport. Despite payment by **Beneficiary NO,** Nucare billed and the Government paid for this transport. Whether or not **Beneficiary NO** paid for the transport, the Government expert found that this transport was medically unnecessary and should not have been paid by the Government.

48.  As another example of a medically unnecessary ambulance transport, Nucare transported **Beneficiary CM** on March 1, 2004 from a hospital to a residence, where he lived alone.  **Beneficiary CM** required a cane or walker for ambulation, but was independent in activities of daily living. There is no other evidence that **Beneficiary CM** could not have traveled safely in another type of vehicle. The Government's expert reviewed the records for

_____

BPM Section 10.3 states that "an ambulance transport is covered to the nearest appropriate facility to obtain necessary diagnostic and/or therapeutic services." (Emphasis added.)

**Beneficiary CM** and found that this transport was medically unnecessary. Nucare billed and was paid by the Government for this medically unnecessary ambulance transport.

49. On February 20, 2002, Nucare transported **Beneficiary BD** from a hospital to an extended care facility. The Government's expert reviewed the records for **Beneficiary BD** and found that this transport was medically unnecessary. While in the hospital, **Beneficiary BD** was transferred from an Intensive Care Unit bed to a bed on a regular medical floor in a wheelchair and was "alert and cooperative." There is no evidence that **Beneficiary BD** could not have traveled safely in another type of vehicle. Nucare billed and was paid by the Government for this medically unnecessary ambulance transport.

50. Another medically unnecessary ambulance transport occurred when Nucare transported **Beneficiary EB** on March 21, 2002 from a hospital to her residence. The Discharge Summary states that the patient "eats well, walks well and she is doing very well. She was discharged home." **Beneficiary EB** was ambulatory, ambulating "approximately

32

150 feet with a walker…up and down 10 steps with minimal assistance" during physical therapy, and there is no other evidence that she could not have traveled safely in another type of vehicle. The Government's expert reviewed the records for **Beneficiary EB** and found that this transport was medically unnecessary. Nucare billed and was paid by the Government for this ambulance transport that was not medically necessary.

51. As an example of a medically unnecessary ambulance transport, Nucare transported **Beneficiary HC** on September 5, 2001 from a hospital to a skilled nursing facility (SNF). At discharge, **Beneficiary HC** was "up ad lib with walker." The ACR states that **Beneficiary HC** was to be "transported in a position of comfort." The Government's expert reviewed the records for **Beneficiary HC** and found that this transport was medically unnecessary. **Beneficiary HC** was ambulatory with the assistance of a walker and there was no other evidence that the patient could not have traveled safely in another type of vehicle. Nucare billed

33

and was paid by the Government for this medically unnecessary ambulance transport.

52. Nucare transported, billed and was paid by Medicare for 436 individual transportation claims when the transport was not medically necessary.

53. By intentionally submitting false Medicare claims to Palmetto and/or BCBS for payment, the Defendant violated the False Claims Act.

## VII. FIRST CAUSE OF ACTION
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1))

54. Plaintiff repeats and realleges Paragraphs 1 through 53 as if fully set forth herein.

55. Nucare knowingly, either by actual knowledge, reckless disregard or deliberate ignorance, presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

56. By virtue of the false or fraudulent claims made by Nucare, the United States suffered damages and incurred investigative costs, and therefore is entitled to statutory

34

damages under the False Claims Act, to be determined at trial, plus civil penalties, interest, and investigative costs.

## VIII. SECOND CAUSE OF ACTION
(Payment by Mistake of Fact)

57.  Plaintiff repeats and realleges Paragraphs 1 through 53 as if fully set forth herein.

58.  This is a claim for the recovery of monies paid by the United States to Nucare as a result of mistaken understandings of fact.

59.  The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Nucare's certifications and representations, paid Nucare certain sums of money to which it was not entitled, and Nucare is thus liable to account and pay such amounts, which are to be determined at trial, to the United States.

## IX. THIRD CAUSE OF ACTION
(Unjust Enrichment)

60.  Plaintiff repeats and realleges Paragraphs 1 through 53 as if fully set forth herein.

35

61. This is a claim for the recovery of monies by which Nucare has been unjustly enriched.

62. By directly or indirectly obtaining Government funds to which it was not entitled, Nucare was unjustly enriched, and is liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## X. FOURTH CAUSE OF ACTION
(Fraud)

63. Plaintiff repeats and realleges Paragraphs 1 through 53 as if fully set forth herein.

64. This is a claim for the recovery of monies paid by the United States to Nucare as a result of fraud.

65. The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Nucare's certifications and representations, which were in fact false, which Nucare knew to be false, paid Nucare certain sums of money to which it was not entitled, and Nucare is thus liable to account and pay such amounts, which are to be determined at trial, to the United States.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Nucare, as follows:

1.   On the First Cause of Action under the False Claims Act, as amended, for the amount of the United States' damages, trebled as required by law, investigative costs, and such civil penalties as are required by law, together with interest;

2.   On the Second, Third and Fourth Causes of Action, for payment by mistake, unjust enrichment, and fraud, for the damages sustained and/or amounts by which Nucare was unjustly enriched or by which Nucare retained illegally obtained monies, plus interest, costs, and expenses; and

37

3.   All such further relief the Court may deem just and proper.

                              Respectfully submitted,

                              RIPLEY RAND
                              United States Attorney


                              _/s/ Cheryl T. Sloan    _____
                              Cheryl T. Sloan
                              Assistant U. S. Attorney
                              Middle District of North Carolina
                              NCSB #12557
                              P. O. Box 1858
                              Greensboro, N. C. 27402
                              336-333-5351

Case 1:13-cv-00254-WO-JEP   Document 1   Filed 03/27/13   Page 38 of 38